Thank you. May it please the court, counsel. Despite the complexities of qualified immunity, this is a fairly straightforward case. This court is tasked with determining whether or not there are genuine disputes of material fact which, if a jury were to resolve in the plaintiff's favor, would satisfy deliberate indifference. And then, if so, was the law clearly established at the time? The video evidence in this case clearly shows that Mr. Boykin had expressed that he could not breathe, that he was needing help, and that the officers in this case simply did nothing in response. This happened at the scene with Officers Hobbs, Weaver, and then Scott when he was relayed this information. And then further in the transport, when Officer Weaver is seen on video hearing his complaints that he could not breathe, that he needed help, he was going to pass out, and then when he did pass out and she continued to look back at him. The appellees in this case argue that they did not have subjective awareness of a serious risk of harm, and therefore they could not be liable for deliberate indifference. The district court then found that there were no disputed material facts regarding their subjective knowledge, and thus there was no deliberate indifference. And even if there were, the law was not clearly established. But those are both erroneous findings because they are inconsistent with common sense as well as this court's precedent. As Judge Dennis stated in his dissent in the Coby-Cogdill case, it should be left to a jury to weigh the competing evidence and resolve the factual disputes, most particularly defendants' subjective states of mind. And that's really the crux of the issues in this case is what were the defendants thinking? And because there is evidence on both sides, because there is evidence that would allow a jury to resolve this dispute in plaintiff's favor and find that there was deliberate indifference, and because the law was clearly established, we ask this court to reverse and remand down so that these issues can go before a trier of fact, the jury. The first— Counsel, did Mr. Boykin know that he had sickle cell trait? It's my understanding that he did not know that he had sickle cell trait, but I think it's important to acknowledge that the issue isn't whether the officers knew about sickle cell trait or if the officers knew that there was a sickle cell crisis going on. The issue is whether or not the officers knew that Mr. Boykin could not breathe. There is a lot of talk in this case regarding symptoms versus diagnosis. And I think it's important to point out that in Rodriguez— But why he could not breathe at what point? Because it seems to me that in the beginning, most of them could not breathe after they were running for a while. So at what point on that continuum does it matter for purposes of this case that he could not breathe? Yes, Judge Douglas. I don't know that there is a defined point in time when the can't breathe or being out of breath from running is distinguishable. I know that in this case, Officer Altamirano obviously was also to the side. She had asthma and she couldn't breathe for a little bit as well. What I think is important here is that she caught her breath, just as anyone who is tired from running would catch their breath. But Mr. Boykin never did. He continued to express that he couldn't breathe long after someone would reasonably have caught their breath from a long run. And this is especially true during the transport where he's heading towards the drill with Officer Weaver and he's continuing to state that he can't breathe. And then his condition deteriorates into not only can he not breathe, but he's going to pass out. He hits his head on the divider in the car and she looks back at him. And then she sees that he actually does pass out. She can hear that he's no longer responding to her questions. She makes a comment later on, and this is at the record at 3194, it's the in-car camera, and it's at the 1650 to 1658 mark of that video. She says, you know, somebody that passes out isn't able to stop themselves from falling forward, right? Fun fact. And what I think is important about that is that she's noting that he looks like he's passed out. Why else would she say someone that passes out unless she looked back at him and acknowledged that he looked unconscious? Well, let me just say, the videos are horrific. And I mean, it's a horrible and tragic case. But we've seen them, and we understand what you're talking about. And I think everyone has deep sympathy. And it's horrible. It's horrible. But the thing I can't figure out is that when she's saying that, she's in a conversation with him. And he seems to sort of go forward and then back. He'll kind of come to. He'll say something. And he's talking to her all the way up until the 13th minute of the video where the camera is facing Mr. Boykin. So he's speaking well enough. Again, he's clearly struggling. But he's speaking well enough to have a conversation with her about the air conditioning, about the water, about his legs. And then she makes these comments, which are, especially in hindsight, terrible because we understand that he was struggling with a medical episode. But they're having a conversation, right? So he's not actually passing out. And I took the comment to say that it seems like he's sort of going forward as if he's passing out. And then he comes back to. And she tells you what she thought, right? She tells you subjectively what she was thinking, which was she thought he was faking. Again, it's horrible in hindsight. But that's what subjectively, which is the relevant legal question, right? Yes, Judge Dennis, or excuse me, Judge Oldham. I think that when we look at what she's saying there that, and first off, I would say, I don't know that they were having a conversation as much as he was articulating that he needed help and that he couldn't breathe and was going to pass out. But the fact that she's saying that she believed he was faking, right? That goes to her subjective knowledge of whether or not this was a serious medical issue. And I think that we can all agree that the inability to breathe is a serious medical issue. I would point the court to Fielder v. Boschard, which is a Fifth Circuit case out of 1979. In that case, there was a man experiencing delirium tremens inside of a jail. He did not receive medical care. And the jailers were sued. Their defense was that they thought that he was faking. They didn't think that this was a genuine DT situation. The court denied qualified immunity. It went to trial. They were found liable. And then it came to the Fifth Circuit. And the Fifth Circuit said about that, in a case such as this where the attitudes and states of mind of the defendants weigh so heavily, we are quite reluctant to read between the lines of the record. We commit our trust to the jurors who saw and heard the witnesses. And I think that echoes back to what Judge Dennis had said in his dissent in Cope. And it's that when you have an issue where you don't know whether or not the subjective knowledge was there, then that's something that should be taken before the trier of fact,  I think that we also point to Ford v. Anderson County, Texas, which is a Fifth Circuit case out of 2024. Judge Douglas, I know you were on the panel in that case. In that case, there was a female inmate who was suffering from Addison's disease. However, the jailer defendants in that case were unaware of the diagnosis of Addison's disease. That was an issue for the doctors and the nurses in the case. The jailer defendants were sued for not providing medical care because of hearing her cries out throughout the night and seeing dark vomit in the jail cell. They argued that the plaintiffs had not shown any direct knowledge that they actually were subjectively aware of these things. However, the court found that the plaintiffs had not presented evidence of a jailer defendants directly admitting that they were subjectively aware of Newsom's cries or her dark colored vomit. However, summary judgment evidence indicates that Newsom cried out in an area where they patrolled and that they went into her cell. And so at the summary judgment stage, when all reasonable inferences are taken in the light of the non-moving party, the plaintiff in that case, the plaintiff in this case, it was clear that a jury could find they did hear those cries because they were in the area and they did see that vomit because they went into the cell. And the court went on to state if a jury concludes that Strong and Jones heard these repeated cries for help and did nothing to assist Newsom, to assist Newsom, they could reasonably find that this conduct constituted deliberate indifference because they refused to treat, they ignored complaints, and they evinced a wanton disregard for her serious medical needs. And that's what we have in this case. We have that Officer Weaver is looking back. She looks back 14 times over her shoulder at Mr. Boykin. And that's according to the appellee's own expert. That's at, um, 1307 of the record. Um, she also looks back through the rearview mirror. That's at 1303, 14 times. She's looking through the mirror at Mr. Boykin. And this is a disputed fact in the case, whether she was looking and saw Mr. Boykin or whether she didn't. But she had the opportunity to by looking in the mirror and by looking back and staring at him just as the defendants did in the Ford case when they were in the area where the cries occurred and they went into the cell where the vomit was. So at this point we have evidence that Officer Weaver did in fact know, if the jury would have resolved this dispute for the plaintiff, that Officer Weaver did in fact know that he was unconscious after he had been saying that he was going to pass out, after he had been complaining that he couldn't breathe. That would give us, at the summary judgment stage, a genuine dispute of a material fact which would carry us over to the, the jury. Um, further I would just point back to, Officer Weaver kind of says two different things here. She says, I didn't know about a serious risk. Also, I thought he was faking. Okay, well if you thought he was faking then you did know about it, you just didn't believe it. So was it that you didn't know about the serious risk or that you knew about it and you didn't believe it? Either way I point to Ford or to Fielder to address either one of those issues. She says she didn't know about the risk or does she say she just thought he was exhausted from the run? I think she says both things, Your Honor. And that's, she says that she didn't know there was a serious risk here, but then she says regarding his inability to breathe and that he was going to pass out, she thought he was faking. However, she acknowledges that he, he appears unconscious in the backseat of her car during the quote that I read earlier to the court. Suppose, and I'm not sure how this, I guess this is one question, which is how you would do the qualified immunity inquiry on these sets of facts, but imagine that we were free to do a frame-by-frame of the video and we were to agree with you that sure, so she makes the comment that you objected to earlier about the, you know, fun fact, again in hindsight very callous, but she makes that at 1650, timestamped on that video where you're looking back at Mr. Boykin. So imagine that we agreed with you that at that point she had deliberate indifference. Could you win? But not until that point, right? That she had a reasonable good faith basis while he was awake and talking and talking about air conditioning and water up until that point. So let's just give you say 1645, right? So shortly before she makes that comment, could you win? Judge Oldham, I think that there's a two-part answer. First, yes, I think we could because she does nothing at that point to alert the jail. They need to have medical staff ready to say we need an ambulance there. We need nurses prepared. No one was ready to provide medical care for him once she got to the jail. Additionally, when she gets to the jail, she's not in any sort of urgent rush to get him out. She just... Is that your second point? That's my first point. I want to hear them both, but I'll... Yeah, my first point is I don't believe she did anything. And that's what the case law says, right? If you go back to Thomson v. Upshur, if you go back to Dyer, if you look at these things, they say that if you are aware of a serious medical issue and do nothing to provide medical care for that person, then that's deliberate indifference. And she had nothing, even if you were to take it to the 1645 mark of the video and go from there. She did nothing until she gets in the garage, right? So I do think we could win there. Second is, I wouldn't take it to the 14... 1645. 1645 mark. I would take it, if you're going to take it, if you don't go all the way back to when she hears him calling out that he needs help and that he's going to pass out and all of those things, then when she's passing the hospital, he has gone unconscious, and she continues to look in her rearview mirror at him and look back at him. At that point, you can hear her begin to ask more questions, because she can see that now he looks unconscious in the back seat, and he's no longer responding to her. There had been a... I can't see the hospital in the video that I'm looking... Could you see it? So what is the timestamp of that? And I don't have the timestamp for you at this moment. When she's passing by the hospital, you see it in the reflection on the car. But let me see if I can pull up that timestamp for you for our rebuttal. I think it may be in the briefing, though, when we say that when she's going by... Okay, so I want to go back to the first point, right, before we move off, because you said the first point was you could win at 1645, because she didn't do anything. Right. But of course, at 1645, she's like a minute and 15 seconds from the police station. She pulls into the police station. She immediately gets out of the car. The first thing she does is a sternum rub. She pulls him out, and she freaks out. And it's really... The videos are really hard to watch on a lot of different levels, but one of the reasons that... I mean, obviously, it's tragic for Mr. Boykin, and again, I can't say it enough. But it's also... The officer is clearly upset and is yelling for paramedics. She obviously knows that there's a paramedic crew right there, and they show up like that. And so why would that be an unreasonable determination to say... Because just imagine that she knew at 1645... Because this, I would think, would be the best facts I can imagine for you, which is at 1645, she knew that there was a risk and was deliberately indifferent. She makes a terrible and callous comment. But even then, it's about a minute and a half, a minute and 15 seconds until she's got medical care. And I'm not sure what better she could have done under those set of circumstances. Well, I think that what she could have done is used her radio to call for help. I mean, that's exactly what she could have done at the scene. That's what she could have done in the first minute of the ride, the second minute, the entire time. She could have said, We need an ambulance. We need some medical care. Or, We need the jail nurses out in the garage. This man is experiencing some sort of medical issue that we need to give him attention. I would also point the court to 1520 to 1522, that same video, at 3194, when she says, All right, you know you're still going to jail either way, right? This is another moment where she's acknowledging that he has appeared and passed out in the back of his car. At the time she said that, I think he had stopped responding. That's correct. He stops responding much earlier than these comments are made. But if you're looking at points in time where she acknowledges something at the 1645, I would take you back even further to the 1520 mark. But then again, I think that when she is passing the hospital and starts to ask more questions, Where do you live, things of that nature, to try to get a response, she understands he's no longer responding to me. There was a back and forth here where he kept complaining and asking for help, but now he's not saying anything to me. So I think at that point, if you don't want to take it back to where he's complaining, if you want to wait until he actually goes nonresponsive, which I don't believe is the rule. I don't believe the rule is you have to wait until someone goes nonresponsive before you give medical care. I wanted to make sure you got out the rest of your argument, but if you can give me one more minute, I want to make sure I get an answer to this. She tells you at minute 27 what she was thinking. She thought it was the felony faint. That's what she says at 27 on the stamp, right? So this is after other people have taken over the CPR. They're loading him into the ambulance. So isn't it true that in order to get past summary judgment, you would have to come with some material fact to show that she was lying? I mean, that's basically, I mean, we put all of these Eighth Amendment labels on it, but at the end of the day, you have to show that we should get to a jury to prove that she was lying. She didn't think it was the felony faint. She knew, and she deliberately was indifferent to the fact that he was dying of sickle cell tracheotest. And again, not deliberately indifferent to the sickle cell tracheotest. She did not know about that.  Deliberately indifferent to the fact that he was unable to breathe. I think that the evidence that we have is that the video shows her looking at him. If someone were to look at someone who's bleeding out on the ground and then say, yeah, I thought it was Halloween blood and didn't do anything for them, they wouldn't get off just because they said, oh, I thought it was fake. You had the ability to see what was going on, and was it reasonable for that reaction to be what you did? And that's what a jury should be determining. The jury should determine, was it reasonable for her to think it was fake? Did she actually, or is she just saying this after the fact because she can't say, yeah, I knew he was unconscious and I didn't do anything. Very good. You've saved time for rebuttal. Thank you very much. I'd ask the deputy to give two extra minutes to Mr. Coleman. May it please the court. Counsel. Summary judgment should be affirmed because the defendants were not aware that Mr. Boykin faced a substantial risk of serious harm. All the defendants reasonably believed that Mr. Boykin was exhausted from the foot chase on a very hot and humid day, and the underlying medical condition, the sickle cell trait, was unknown to the defendants. The medical event that occurred that Your Honor just mentioned is ECAST, exercise collapse associated with sickle cell trait. It is a very rare medical event, and the undisputed testimony in this case from both the plaintiff's medical expert and the defense medical expert is that it is extremely difficult even for medical doctors to diagnose that condition and that it is impossible for laypersons to diagnose. How do you take the diagnosis out of it though? If someone is exhausted from a run, I guess there's no way to put like an exact timeline on that, but when does it become unreasonable to believe that this person still is unable to breathe because he ran five minutes ago, ten minutes ago, fifteen minutes ago? Your Honor, I don't believe there is a case that I've seen that has a time frame on it. I think it's going to be in the context of every situation. In this case, let me answer the question that way. Mr. Boykin ran a very, very long way, and the videos show he wasn't at the scene that long. After the arrest, after he was placed in handcuffs, placed in the patrol car, there was a few minutes of discussion with the college police officers, and then Officer Weaver began transporting Mr. Boykin to the jail. This is not a lengthy period of time. For someone, particularly on this day, as hot as it was and as humid as it was, I think it's extremely reasonable, it's not objectively unreasonable for Officer Weaver to believe that someone in everybody's medical . . . I don't know if I could run a half a mile on a hot day, but everyone's medical conditions or stamina is a little different. As far as Officer Weaver, she testified and she believed that he was just simply exhausted from the run and continued to believe that until she found him unresponsive in the back seat. Why shouldn't the jury make the determination of whether or not that was a reasonable belief? Your Honor, I would love to explain that. If I may, I would like to dovetail into that if I can. The reason is this. Let me just briefly talk about the summary judgment evidence that was before the trial court. I want to focus in on the time period from the time Officer Weaver left the scene with Mr. Boykin until the time he arrived at the jail. This is the summary judgment evidence that was before the trial court. First, Officer Weaver testified that she had no knowledge at all that Mr. Boykin was in medical distress. In fact, she gave a statement that very night to investigators who were looking into this. That was her statement that night. She could not and did not see Mr. Boykin's face and eyes in the back seat video. I think the court understands this, but in the front seat of that particular patrol car, there's not a monitor for that camera that's in the back seat. That testimony regarding what she could see or not see and when she could see it was confirmed by Alex Germain. Mr. Germain was a retained expert for the defendants. He reconstructed the patrol car using 3D technology. He was able to, based on her height and the study that he did, he was able to show what she could see and what she could not see in the rear view mirror or when she turned around. That video is before the court. Actually, Mr. Germain used a blue inlay as to what Officer Weaver could see and could not see. Before the trial court was Officer Germain's report. That report and all that testimony and all that evidence went unrebutted by the plaintiffs. Also before the court was Texas Ranger testimony who testified that a reasonable officer under the same circumstances would not have had actual knowledge until the arrival at the jail and the attempt to get Mr. Boykin out of the back seat. That was unrebutted. Dr. Stacey Hale, probably one of the most renowned emergency medicine doctors in this nation, testified that in her opinion, upon reviewing the video, that Mr. Boykin went extremis, meaning dire condition, during the latter half, as we've been talking about earlier, in the latter portion of that transport. Her testimony is important because the plaintiffs agree with that. In the plaintiff's complaint, both the plaintiff and the intervener plaintiff's complaints, they state in their pleaded facts that Officer Weaver could not see Mr. Boykin in the latter half of the transport to the jail. Mr. Thomas Kearse, his testimony was also before the trial court. He's a law enforcement expert and he gave testimony that Officer Weaver was not subjectively aware because this was a medical condition that is very rarely encountered by peace officers. That testimony went unrebutted. I believe the most telling testimony before the trial court was the testimony of Dr. Francis O'Connor. That is the plaintiff's retained medical expert. He watched the opinion. It was also his opinion that he believed, and this is his testimony, he believed that Officer Weaver became aware of Mr. Boykin's serious condition when she opened the back door of the patrol car at the jail and did a sternum rub. That is their expert's testimony. In his testimony, he testified that he believed Officer Weaver simply misconstrued the circumstances. Misconstruing the circumstances is not deliberate indifference. Your Honor, when you spoke earlier about the video and the reaction of Officer Weaver that she freaked out, when you watch her body cam video and when she arrives at the jail, when she walks around the other side of the car and opens the door, she says, all right, we're here, very calm voice, and then she says, I'm not picking you up. I don't want to drag you out. Come on. Quit playing. And then all of a sudden, she reaches in, performs the sternum rub, and she screams, Darin. And then she yells for her sergeant who's approaching, and that's when she gets on the radio and urgently asks for the jail nurse and for EMS and the response. Her response is telling. It is so telling that that is the moment in time that she first became subjectively aware that Mr. Boykin was in a serious medical condition. That circumstance is very akin to the case of Aguirre v. San Antonio, and that is a case where police officers arrested an individual. I believe in that case, I think the individual was hogtied or something like that. And on the video, it shows the officers, and I think the description, I think, the description in the case is that the officers were lighthearted or smiling or something like that. And the plaintiffs in that case were trying to make the argument that that lightheartedness, the smiling, was some evidence of subjective awareness. And actually, this court in Aguirre v. San Antonio stated that no, because when the officers realized the arrestee in that case was unresponsive, their demeanor changed instantly. They became very serious. They ran and got a medical kit. They called EMS. They did all the things you should do to respond to that type of emergency. And this court stated that the change in demeanor was evidence of subjective unawareness before the event. So, Your Honor, for all of those reasons, we believe that the trial court was absolutely correct in that the plaintiffs presented no evidence from which a jury could reasonably infer that Officer Weaver subjectively knew Mr. Boykin was in medical distress. There was no evidence to counter any of that hard evidence, including the videos that were before the court. Your Honor, I would like to, in just the time I have left, I want to address the issue of qualified immunity directly, and specifically the second prong of qualified immunity, which is the analysis of whether or not the constitutional right at issue was clearly established at the time of the violation. And, of course, for law to be clearly established, there must be a robust consensus of persuasive authority that defines the case. It must place the constitutional question beyond debate. And this is critical. The core purpose of having, for qualified immunity, clearly established law is a concept of fair warning. It's a fair warning to peace officers, to reasonable peace officers, so that they will know what actions or inactions on their part are constitutional or unconstitutional. It's a fair warning analysis, and the burden, of course, is on the plaintiff. The plaintiff has the burden. In the case law, it's a heavy burden to show that the law was clearly established. With that in mind, I want to point out that this case has a very unique qualified immunity twist, I guess is what I call it, is that throughout this entire case, the plaintiffs have pled and argued that the defendants should have summoned emergency medical assistance to the scene. That is what was in their original complaint, in amended complaints. That is what was addressed by their expert. That was the basis of a lot of their discovery. It was the plaintiff's case. The plaintiff's case was that the defendants should have summoned emergency medical services to the scene. The defendants, and let me say this, the event, of course, that we're here about occurred in August of 2019. We filed the defendant's motion for summary judgment and pointed out from the Reed v. Nacogdoches case that it was not until July of 2021 was that failing to call for emergency assistance in the face of a known serious medical emergency violated the Constitution. In August of 2019, it was not clearly established that failing to call for this medical crisis was a constitutional violation. That was not until July of 2021. That was our briefings in the motion for summary judgment. At the summary judgment hearing before Magistrate Baxter, the plaintiffs conceded that their failure to summon medical assistance claim failed as a matter of law because the law was not clearly established in 2019. What was the nature of that concession? Was it oral? Was it written? The Reed v. Nacogdoches case . . . No, I'm sorry. You said at the summary judgment hearing, I thought. The summary judgment hearing in our case? Maybe I misunderstood what you're saying. Where was the concession that you're referring to? The summary judgment hearing in this case. What was the nature of the concession that you're relying on? The court was questioning plaintiff's counsel about the fact that not until July of 2021 was the law clearly established on that point and it was conceded. In fact, it's on page . . . on the reporter's record, it's on page 102 of that record. It's also noted, Your Honor, in the district judge's order adopting the report and recommendation. What I'm telling you now is at page 12, at the bottom of page 12. After this concession that their failure to summon emergency medical assistance claim failed, the plaintiff's argument then became, well, the defendants should have done something. However, in their response to the motion for summary judgment, at the summary judgment hearing and in their brief to this court, the plaintiffs don't explain what is that something that they're claiming the defendants should have done. They also don't explain whether the law was clearly established on that something, whatever it is they're claiming. The defendants in this case did do something. Mr. Boykin, very promptly after his arrest, was taken out of the heat, taken out of the sun. He was placed into the backseat of a patrol vehicle. The air conditioning was turned on. After a few moments, he yelled out, Officer Hobbs went over. Officer Hobbs opened the backseat, talked to him. This is important, I think. Officer Hobbs' body camera really shows this well. Mr. Boykin is . . . the sickle cell trait, Your Honor, I do agree with the court that this is a very tragic situation, but the video does show that Mr. Boykin's chest is rising and falling and he is talking to Officer Hobbs. Officer Hobbs turns on the air conditioning on high, asks Mr. Boykin something to the effect, are you feeling that? These actions, the things the officers did, getting him in a patrol car, getting air conditioning, talking to him, not ignoring him, those acts were not objectively unreasonable. Your Honor, the plaintiff's burden of proving a clearly established law, they essentially changed their whole theory of the case at the motion for summary judgment. They've not identified what is it exactly they're claiming these defendants should have done and they have not presented this court with any clearly established law that says that's what they should have done. If they don't do it . . . I'll move a little bit closer at the concession, but I think my understanding of your argument is that it was not clearly established that medical attention should have been sought until July of 2021? Correct. Are you familiar with the Dyer case and how does the Dyer case play into that? Because I think that in that case it says, officers who despite being aware of the detainee's dire condition, did nothing to secure medical help at all, were on fair warning that their behavior was deliberately indifferent. That is, I believe, in 2020, correct? I believe that's the year of that case. How does that play into your argument that it was not clearly established until sometime in 2021? Yes. The Reed case, the original decision in July of 2021 was the Cope case. That was the case that found that . . . in fact, the court very clearly says that until this . . . we now pronounce that failing to call reasonable medical or emergency medical assistance in the face of a serious risk of harm is unconstitutional. That was reaffirmed in a different context in the Reed versus Nacogdoches County case. Your Honor, I believe that is the . . . I'm not sure of the Dyer . . . I know what the Dyer case is and I understand the facts of that case, but even that would have been after August of 2019. Our argument, Your Honor, is that the plaintiffs have not really clearly identified what is it . . . if not calling emergency medical assistance is not unconstitutional at that time, then what is it they're now claiming and where is the clearly established law that puts reasonable peace officers on notice for that action? I would also draw attention, just before I run out of time here, in a Rule 28J letter presented to the court just a few days ago, I just want to bring to the court's attention the two prior January of 2025 cases. I do certainly recognize that those are 12B6 motion to dismiss cases, but the core Fourteenth Amendment principles expressed in those cases, I think, are applicable here. In Carmona v. City of Brownsville, this court in January of this year held that our courts have consistently held when an arrestee suffers from non-visible injuries and the complaints are nonexistent or do not reveal the full extent of the injuries, then the action is not deliberately indifferent. In Stapleton v. Lozano, also in January of this year, in a case where a passenger had ingested drugs unbeknownst to the officers, but did tell the officers, I'm not feeling well, and then once the arrestee was placed in a jail cell, started making complaints, and there the court held that an officer's failure to recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference. Your Honor, we believe that the magistrate judge and the district judge in adopting the report and recommendation were absolutely correct and that this was a symptoms case. This is a case where the officers, unlike Felder v. Broussard and Ford v. Anderson that counsel argued a few moments ago, those two cases, if you look at the facts of those cases, those are cases where the officers or jailers were absolutely told this arrestee or this prisoner has this condition. They need this medication. In fact, in the Ford case, the jailers were told of the Addison's disease, the person had been in jail for months. The conditions in those two cases were long, there's long history that the officers knew or should have known, not should have known, knew that of the medical condition and then ignored symptoms that clearly would have related to those medical conditions. We don't believe Ford and Felder have any applicability to the case at  This is a symptoms case. I also direct the court to Bastis v. Thoreau. That is a case in which the issue of sickle cell trait was also addressed. It was addressed by the plaintiff's expert in making a claim. I believe this court stated that in that opinion, it is hardly the kind of medical need that a non-medical expert would understand required attention. Your Honor, I think we focused on Officer Weaver pretty much almost exclusively here today. Officers Hobbs and Scott had extremely minimal contact with Mr. Boykin. Officer Hobbs was the one that increased the air conditioning and spoke to him and observed him. Sergeant Scott had absolutely no interaction with Mr. Boykin. Your Honor, the evidence before the court, before the trial court was that Officer Weaver was not subjectively aware. The trial court was correct in finding that a reasonable jury could not infer it. That video, the evidence, the testimony, everything shows that Officer Weaver did not recognize Mr. Boykin was in a serious medical crisis until the moment she discovered him in the backseat, and that's on video. We request the summary judgment be affirmed. Thank you, Your Honor. Thank you. All right. We will hear rebuttal from Ms. Boss. May it please the Court, Your Honor, this isn't a case about ambiguous symptoms. This isn't a case about a magical off switch where they should have realized he wasn't breathing. This wasn't a case about not being aware of a diagnosis. This is a case about if the inability to breathe and losing consciousness presents a serious medical issue. I would submit to you that if any of you, if anyone in this courtroom said I cannot breathe and they complained of that problem, we would stop this proceeding and we would check on them because even a lay person would know that is a serious medical issue. Counsel, is that what you think that Officer Weaver should have done? I'm sorry, Your Honor. Can you repeat the question? I would like you to be as precise as you possibly can in telling me what Officer Weaver should have done. At the very beginning of the encounter when Mr. Boykin is saying that he can't breathe and I feel like I'm going to pass out even at the scene of the arrest, she should have called for medical attention. Okay. So I'm glad you said that because that is at least consistent with what your friend said in the topside argument but I don't understand how we can reach it. When I'm looking at page 4,286 of our record on appeal where I gather that Mr. Illich was your trial counsel?  Talking to the magistrate judge and the magistrate judge says you just mentioned failure to do anything. Weaver had a failure to do anything. Mr. Illich says failure to act and then the court, this is the magistrate judge Baxter, says yeah, you agree that it would not be claiming that she failed, that's Officer Weaver, failed to call EMS during transport. That itself would not be enough. Yes, Your Honor. Is that right, the court says? Yes. And then it gets on to the rest of the argument which is that he should have done something. I'm not exactly sure what the something is but the failure to call EMS can't possibly be the thing that you think Officer Weaver should have done, right? I mean that's for multiple reasons. One would be it's conceded in the district court. No, Your Honor. So it's not that I'm saying or we are saying that the failure to call EMS specifically is the issue, is that she didn't do anything at all. And that's what the Fifth Circuit President says. She has to do something. That is what the Dyer case says. That is what Filder Boshart says. That is what Niren says. That's what Domino v. Texas Department of Criminal Justice says. That's what Easter v. Powell says. If there is a dire, serious medical issue, officers have to do something when they are subjectively aware of it. Well, she did lots of things and we can argue that, I mean, as I say, the videos are hard to watch and we can argue that she should have done something differently. But it's not like she sat there and watched him, right? She talked to him. She turned on the air conditioning. She told him about the water. They had a conversation. She drove him to the hospital or to the police station. She gave him a sternum rub. She gave him CPR. We can argue that she should have done other things but it wasn't like she was sitting there watching the man die and doing nothing. Well, I would submit to you that she was, Your Honor. During the transport, Mr. Boykin is saying statements like, I'm going to pass out. I need help. At the scene he's even saying these comments. He's saying I can't sit up. He's saying please help me. He's saying I'm about to pass out. That starts at the scene of the arrest and that continues during the entire transport and she does nothing when he's saying those statements. The fact that she may have reacted when they get to the jail, that's going to be up to a jury to decide if that goes to her subjective intent. The Thilder v. Brothard case says that when there is this issue of the line between misfeasance and a conscious cruelty, when there's attitudes and state of minds of the defendants weigh so heavily, it should be up to the jury to decide. This circuit has said we are quite reluctant to read between the lines of the record when it's something regarding the attitudes of the defendants. And I'm glad you brought up Thilder because in Thilder, the mom of the man who passes away comes to the jail and says, my son has a virus. He's sick. He hasn't eaten. I brought him food. And the jailer makes a bunch of snide comments, throws the food in as if he was throwing bread to dogs, like really bad facts. But the thing that is really important, we said in 1979 is that the jailers had a reason to believe that this was something serious. The mom literally says he's sick. He hasn't eaten. And the jailer is like, well, we'll give him coffee and biscuits. There's a very conscious and deliberate misunderstanding of the risk that's in front of him. So I want to come back to you and I want to make sure I understand, can you tell me specifically what Officer Weaver should have done that she did not do? She didn't take him to the hospital. At the point in time at the scene, he's saying, I cannot breathe. When she passes the hospital, and, Your Honor, that's going to be at the 15-20 mark in the video, when she passes the hospital, she sees that he's going for it. She doesn't do anything. When she's still driving, she does not deter to the hospital. She does not call the jail and say, I have someone that's saying that I cannot breathe and I'm going to pass out. She does nothing. The defendants at the scene also did nothing. And in the Dyer case, as you talked about, Your Honor, that says that if there is a serious medical need that is known to the officers, they have to do something. And Dyer was decided in what year? The Dyer v. Thompson case was decided, excuse me, Your Honor. Okay. So the Dyer case is a case that's talking about the clearly established case that was decided in, that's what happened to the Dyer case in Nashaw in 2013, but it was decided in 2020. The Copp case specifically that opposing counsel has talked about was about failing to promptly call for emergency medical assistance because Jack Jalor did not call 911 or did not call anyone. That's not specifically what we're saying really is the issue. We're saying that there's a serious medical issue and nothing was done. That could be calling 9-1-1. That could be getting an officer that's maybe trained in recognizing, or sorry, that's, that is able to give some sort of medical care to the, to the suspect. So it's not just getting to the hospital more quickly or promptly. It's not about that. It's about if I am telling you that I cannot breathe and you as a lay person, and even someone at the scene of the arrest said, I think he's having a heart attack. And they said, it's the felony thing. They did nothing. Even when a common person, a citizen is saying he cannot breathe. It is about that. And it's about that. That's a serious medical issue and something should be done is, is that get to the hospital? Is that call someone there to the scene? Is that go to the hospital when Mr. Boykin is passing out and saying, I can't breathe. Those are all things that could have been done in this case and nothing was done. And that is why we feel like there are genuine disputes of material fact. In this case, your honor about if the officers realize that something should be done and. Counsel, I appreciate it. I want to make sure you got your argument out to give you some extra time, but your lights on. Thank you. Your argument. So the case is submitted. Thank you.